van Gestel, J.
This matter is before the Court on the application of the plaintiff, EMC Corporation (“EMC"), for a preliminary injunction against the defendant Kenneth Todd Gresham (“Gresham”). Unlike many cases of this nature, the parties have embarked upon fairly extensive discovery before briefing and *129 arguing the issues and the key facts are well understood.

BACKGROUND

Gresham worked for Data General Corporation (“Data General”) from 1996 until September 1999, when EMC acquired Data General and continued Gresham’s employment with EMC. While at Data General, Gresham was Vice President of that company’s CLARiiON Storage Division.
When Gresham came to EMC, his position was Vice President of its Global Systems Alliance group, overseeing EMC’s OEM and reseller business. It appears that, effectively, Gresham continued doing basically the same work as at Data General, with a new EMC title.
In October of 1999, Gresham was asked to execute a “Key Employee Agreement” (the “Agreement”) with EMC that included non-competition/non-solicitation covenants. Initially he refused to do so, but finally acquiesced on December 20, 1999. Among other things, the Agreement provided:
1. Non-Competition . . . For the twelve-month period following the effective date of your termination, for any reason, from the Company, you agree not to directly or indirectly compete with the Company in any manner, including but not limited to directly or indirectly developing, producing, marketing, soliciting or selling products or services being developed, produced, marketed or sold by the Company as of the date of your termination. For purposes of the immediately preceding sentence you shall not be considered to be competing with the Company unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policy-making position with the competing enterprise.
The Agreement also contained provisions regarding customer and vendor confidentiality and confidentiality of company records.
Gresham was contacted in December 2000, by an executive search firm on behalf of Eurologic Systems, Inc. (“Eurologic”) seeking to find a person to oversee Eurologic’s worldwide sales and management team, and possibly to ultimately succeed Eurologic’s chief executive officer.
In March of 2001, Eurologic conveyed an offer to Gresham. Among other things, because of changes in his situation at EMC — a significant reduction in his base salary, a change in his reporting structure, reduced responsibilities and other problems in performing his work — Gresham decided to leave EMC for Eurologic. On March 27, 2001, Gresham accepted the offer to become executive vice-president for Eurologic Ireland and president of Eurologic America. On March 30, 2001, Gresham formally resigned from EMC. Thereafter, EMC made efforts to convince Gresham not to leave.
In exit discussions with Gresham, EMC officers made it known that they considered Eurologic to be a competitor, and also that they would seek to enforce the non-competion covenants in his Agreement.[1] As a result, on April 16, 2001, Gresham turned down the position with Eurologic and formed his own consulting firm called Meritage Associates (“Meritage”).
Through Meritage Gresham then began providing consulting services to Eurologic and others, although Eurologic seems to be by far the principal customer of Meritage. As such, Gresham provides strategic business consulting and advice to Eurologic’s chief executive officer, as well as advice to the CEO on his personal investments. Specifically, as to the consulting advice for Eurologic, Gresham provides advice on the overall structure of the company: the interface between the sales and marketing group and the rest of the company; product development processes; mergers and acquisitions; investment strategy; and efficiency issues.
Gresham is paid by Eurologic on an hourly basis, including reimbursement for all travel and other expenses. As a consultant, Gresham has no officership or other status with Eurologic, such as an employee or director; he lacks any reporting responsibilities or revenue accountability; he holds no stock or options therefor; he has no insurance, no automobile allowance, and no other benefits. He is, however, permitted to use an office at Eurologic when working on matters for it.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, EMC bears the burden of showing its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Gresham, from his being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Before assay-, ing these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the enforcement of non-competition and confidentiality agreements.
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with its customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competí *130 tion, however, Is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
Good will is a broad term and encompasses a variety of intangible business attributes such as the “name, location and reputation, which tends to enable’ the business ‘to retain [its] patronage.’ ” Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961). An employer’s positive reputation or position in the eyes of its customers or potential customers is an element of good will. Marine Contractors Co., Inc., supra, 365 Mass. at 287-89. Good will is also generated by repeat business with existing customers. Id. Good will is a legitimate business interest that an employer is entitled to protect. Kroeger v. Stop & Shop Co., Inc., 13 Mass.App.Ct. 310, 316 (1982).
Gresham’s position at EMC was sufficiently high, that EMC has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition and other covenants of the Agreement with Gresham.
A non-competition agreement, however, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., Blackwell v. E.M. Helides. Jr., Inc., 368 Mass. 225, 228 (1975); All Stainless, Inc., supra, 364 Mass, at 779-80; Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355 (1933). Here, the scope and the one-year time limit involved in the EMC Agreement, is certainly reasonable for the protection of the good will and other matters in issue here. Blackwell, supra, 368 Mass. at 229; Marine Contractors Co., Inc supra, 365 Mass. at 289.
The principal issue that must be examined is whether Gresham, on the record before this Court, is violating the non-competition part of the Agreement. Here the Agreement’s plain language becomes critical. On the issue of “competition” the Agreement has a clear and definite exclusion. It reads:
[Y]ou shall not be considered to be competing with [EMC] unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policy-making position with the competing enterprise.
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation, at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous- terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Key Employment Agreement in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr v. Fordham, 420 Mass. 178, 190 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
Here, where EMC, a sophisticated and knowledgeable entity, chose to embody its relationship with its key employees in a detailed and carefully crafted written instrument, perhaps more than in other situations, it is entitled to and should be held to the contractual language it chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify its expressed statements. “Courts cannot. .'. [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
Contracts drafted by employers to limit the employment prospects of former employees — even those at a very high level — must be construed narrowly against the employer. Sentry Ins. Co. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982).
Here, in order to be considered competing — using EMC’s own language — Gresham must have “an ownership interest amounting to at least 1% in" Eurologic *131 “or an officership, directorship or other policy making position with” Eurologic. On the record thus far established, he has none of these. Neither the word “consultant” nor any derivation thereof appears in the Agreement.
The closest that Gresham can be said to come to fitting within the elements can only be considered on an argument that he, in his consulting work with Eurologic, has a “policy making position.” But even here, that position must be with “the competing enterprise,” Eurologic. Gresham has not been shown to have any position with Eurologic. On the record thus far developed he can only be seen as an independent contractor, not an employee of any kind. Eurologic has no demonstrated control over how or when he does his work. See, e.g., Lyon v. Morphew, 424 Mass. 828, 834-35 (1997). While the situation may seem to be a glaring loophole in the restriction intended by the Agreement, the language chosen dictates the result.
EMC’s argument that the consulting arrangement is a sham remains unproved. Consequently, the non-competition aspects of the Key Employee Agreement may not be enforced at this time and to that extent the request for a preliminary injunction must be DENIED, without prejudice to re-filing if it can be shown that Meritage truly is a sham.
There are, however, other elements to the Key Employee Agreement that seem entitled to enforcement, at least preliminarily. The Court speaks of the provisions relating to customer and vendor confidentiality and to the confidentiality of EMC’s materials. EMC has shown enough that it is entitled to protection on these issues, and that protection cannot be evaded by the abrupt shift in status by Gresham from employee/officer at Eurologic to a consultant.
Gresham agreed “not to use or disclose any . . . customer or vendor information” and to “return all such materials to” EMC. Further, he agreed not to use for his own benefit, divulge or disclose to anyone, “any information not available to the public” concerning EMC or any of its customers or suppliers, all as outlined in Section 3 of the Key Employee Agreement.
Gresham does not have any cover in his Meritage consulting company to avoid these promises.

CONCLUSION

For the foregoing reasons, this Court enters the following limited preliminary injunction:
The defendant Kenneth Todd Gresham is hereby enjoined and restrained from using or disclosing any customer and vendor information of EMC Corportation to any person, firm or entity and from divulging or disclosing to any person, firm or entity, any information not already lawfully available to the public concerning EMC Corporation or any of its customers or suppliers, including any products, product development, business strategy, financial information, or customer or employee lists, technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product, specification, or plan for a new, revised or existing product, or any business plan, marketing, financial or sales order, or the present and future business or products of EMC Corporation.
The foregoing preliminary injunction shall remain in full force and effect until further order of this or any appellate court.

 Because the Court reaches a conclusion on the issues before it on the plain language of the Agreement, it need not, at this time, express or reach a view on whether EMC and Eurologic compete with one another.