RICHMOND BROTHERS, INC. *vs.* WESTINGHOUSE BROAD-
CASTING COMPANY, INC. & another.

Suffolk.    January 7, 1970. — March 3, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Contract,* Of employment, Covenant against competition.

In a suit in equity by the operator of a Boston area radio station to en-
force a covenant by the defendant, in a contract terminating his em-
ployment with the plaintiff as a radio announcer and moderator of a
popular and profitable "talk show," not to "engage in any employ-
ment in radio, television, or advertising, in New England until" five
years after such termination, warranted findings by the trial judge
impelled a conclusion that enforcement of such covenant was not
necessary for the protection of the plaintiff's business interests, where
it appeared, among other circumstances, that the defendant was not
involved in the solicitation of advertisers and that for almost three
years after termination of his employment by the plaintiff he was
absent from the Boston area and the plaintiff continued to conduct
a "talk show" during such period, and it did not appear that the
plaintiff lost any advertising sponsors either during the defendant's
absence from the Boston area or after he returned thereto and began
broadcasting for another Boston area radio station, and a final decree
dismissing the bill was affirmed.

BILL IN EQUITY filed in the Superior Court on July 25,
1968.

The suit was heard by *Roy, J.*

*William Lender (Manuel Z. Sherman* with him) for the
plaintiff.

*John R. Hally (Thomas H. Brown* with him) for Westing-
house Broadcasting Co., Inc.

*William F. Wallace (Irving H. Sheff* with him) for Gerald
Jacoby.

SPIEGEL, J.   This is a suit in equity seeking, inter alia, to
enjoin the defendant Westinghouse Broadcasting Co., Inc.
(Westinghouse) from employing the defendant Gerald
Jacoby (Jacoby), also known as Jerry Williams, to "an-

nounce and broadcast over or through its Boston facilities,'' until October 14, 1970, and also to enjoin Jacoby from so "broadcasting and announcing." The trial judge made "Findings, Rulings, and Order for Decree." The plaintiff appeals from a final decree dismissing the bill "with prejudice and without costs." The evidence is reported.

We summarize the findings of the judge. The plaintiff, operator of radio station WMEX, hired Jacoby as a radio announcer in 1957, at a starting salary of $125 a week. When Jacoby left the employ of the plaintiff on August 28, 1965, "he was earning over $40,000 per year, of which $15,000 was salary, and $25,000 were commissions on the net billings of advertisers on his show." During most of this employment period, Jacoby was employed under written contracts. "At some time during the period of his employment with the plaintiff, Jacoby became" the moderator of a "talk show," which "[a]t the time Jacoby left the plaintiff's employment . . . was on the air six days a week from 10 P.M. to 1 A.M." At the time Jacoby "left the plaintiff's employ, WMEX had one other talk show announcer, and has continued to have two ever since." There was no evidence to indicate that the talk show format was originated by either the plaintiff or Jacoby. In 1965, there were several "such shows on different Boston radio stations; . . . there are presently several such . . . shows on Boston radio and TV stations."

Jacoby's show "was popular with the listening audiences and, as indicated by . . . [his] salary and commissions," the show "was successful and profitable not only to him but to the plaintiff as well. The popularity and profitability of Jacoby's show were due to his abilities in this particular field which he . . . developed over the years." No evidence was presented to indicate "that Jacoby's success resulted from his use of any confidential information, trade secrets, or special training furnished him by the plaintiff."

While employed by the plaintiff, Jacoby was not involved in the solicitation of advertising sponsors, and virtu-

ally his only contact with the sponsors was with regard to the advertising copy to be used during his shows.

On October 15, 1964, Jacoby and the plaintiff signed a three year contract of employment, under which Jacoby was "to be paid $300.00 per week, 15% of the net cash receipts of all advertising broadcasts by him on his show, and $50.00 per week for expenses." The contract contained a restrictive covenant which provided that "for a period of at least three years after Jacoby ceased to be employed by the plaintiff, . . . [he] would not engage in the radio, television, or advertising business anywhere in New England without the plaintiff's written permission."

In early 1965, Jacoby informed the plaintiff of his desire to terminate his contract because of an opportunity to work "for Station WBBM, Chicago, where he would . . . appear not only on radio but also on TV." On June 19, 1965, the parties, after negotiations, entered into a new contract which terminated Jacoby's employment on August 28, 1965. Under this contract Jacoby, in addition to performing his duties was required "to introduce a new radio announcer to conduct the talk show and to train such replacement in the job." The contract also contained a covenant "that Jacoby was not to engage in any employment in radio, television, or advertising, in New England until October, 1970." On August 28, 1965, Jacoby completed his employment with the plaintiff and on August 29, 1965, "began broadcasting over Station WBBM, in Chicago. There was no evidence that after Jacoby's departure from the plaintiff's Station WMEX the plaintiff lost any advertising sponsors while its talk show was conducted by Jacoby's successor."

At the time Jacoby terminated his employment, the plaintiff owed him commissions for advertising broadcasts for June, July and up to August 6, 1965. The operating head of the plaintiff admitted "that Jacoby is owed $3,442.10 in commissions," plus an additional sum of $572.94.

On May 6, 1968, Jacoby's services with Station WBBM, Chicago, "were terminated because that station shifted to

an 'all news' format. Starting some weeks earlier when he knew of his impending release, . . . [Jacoby] had been in touch with representatives of . . . [Westinghouse]." Jacoby subsequently "had direct discussions concerning employment at . . . [Westinghouse's] WBZ Boston stations as a 'talk show' moderator." On July 29, 1968, Jacoby began broadcasting for WBZ's television and radio stations. "Jacoby has not contacted any WBZ advertisers, whether or not WMEX advertisers, since his employment began, except one customer to whom he spoke regarding copy requirements." Furthermore, no evidence has been presented to indicate that the plaintiff "has sustained the loss of any advertising customers since Jacoby began his work at WBZ."

Although only one other WMEX employee was in a comparable position to Jacoby in respect to salary, length of employment and advertising commissions, the restrictive covenant in his contract "was of eighteen months' duration." In January, 1968, a contract between the American Federation of Television & Radio Artists and the plaintiff provided "that negative covenants shall not exceed sixty days in length."

The first contention of the plaintiff is that a number of the "findings of fact by the trial . . . [judge] are not supported by the evidence," and that where the evidence is reported we may review the judge's findings and decide "all questions of law, fact and discretion." It is, of course, well established that "[i]t is our duty to examine the evidence . . . [and that] [w]e can find facts not expressly found by the judge and we can reverse the conclusion reached by him if found to be tainted by some error of law, but the findings of fact made by him are to stand unless we are satisfied that they are plainly wrong." *Willett* v. *Willett*, 333 Mass. 323, 324. *Glovsky* v. *Holly Point Estates, Inc.* 354 Mass. 94, 95. The judge is in the best position to evaluate oral testimony. *Younker* v. *Pacelli*, 354 Mass. 738, 741. Our review of the evidence does not lead us to conclude that the judge was "plainly wrong."

The plaintiff next contends that the "restrictive covenant was reasonable as to time." In determining whether a restriction as to time is reasonable, we must consider the nature of the plaintiff's business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer's business and the right of the employee to work and earn a livelihood. *Club Aluminum Co.* v. *Young*, 263 Mass. 223, 226–227. The reasonableness of the duration of a restrictive covenant "depends on the facts in each case." *Novelty Bias Binding Co.* v. *Shevrin*, 342 Mass. 714, 716. While we recognize the unusual nature of the radio broadcasting industry, its relationship with the listening public and the unique nature of its performers, we are unable to perceive any business interest of the plaintiff which merits the length of "protection" it would receive by the enforcement of the covenant. Jacoby was not involved in the solicitation of advertisers while an employee of the plaintiff. Hence, he was not in a position whereby his competition with the plaintiff would result in any exploitation of previous contacts and thereby injure the plaintiff's established business. Moreover, there was no evidence introduced which would indicate that the plaintiff had, in fact, lost any advertisers since Jacoby returned to the Greater Boston area. See *Club Aluminum Co.* v. *Young, supra,* at 227–228. Furthermore, the nature of the broadcasting industry is such that Jacoby was not in possession of any of the plaintiff's trade secrets or confidential information communicated to him during the course of his employment.

The plaintiff also claims that "Jacoby's immediate success upon his return to the Greater Boston area is a direct product of the plaintiff's expenditures and promotion." It further contends that "Jacoby was a unique product of plaintiff's business established over many years." Even though a broadcasting company may have expended large sums to promote a performer's popularity with the listening public, it would indeed be difficult to determine that such expenditures and promotion have resulted in the performer's popularity.

The performer's popularity may well be attributed to his own personality and ability. Even if we assume that the plaintiff's promotion of Jacoby resulted in his popularity, we believe that Jacoby's absence for almost three years from the Boston broadcasting area sufficiently protected any business interests of the plaintiff. During this period the plaintiff continued to conduct a "talk show" during the time slot previously occupied by Jacoby. Thus, during the period when the plaintiff was most vulnerable to competition from Jacoby, there was no such competition.

"[A]n employer cannot by contract prevent his employee from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the course of the employment. The employee may achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer." *Club Aluminum Co.* v. *Young, supra,* at 226–227. This court in the above case quoting from the case of *Herbert Morris, Ltd.* v. *Saxelby,* [1916] 1 A. C. 688, 714, stated, "'a man's aptitudes, his skill, his dexterity, his manual or mental ability . . . ought not to be relinquished by a servant; they are not his master's property; they are his own property; they are himself . . . .'" We are of opinion that the restrictive covenant in the 1965 contract is no longer reasonably necessary for the protection of the plaintiff's business. Enforcement of the covenant beyond the years of Jacoby's absence from Boston would merely be protecting the plaintiff against ordinary competition. It is not entitled to such protection.

In view of our determination that it is unnecessary to enforce the covenant to its full extent in order to protect the business interests of the employer, we need not treat with the plaintiff's other arguments.

The judge rightly concluded that the plaintiff was not entitled to "equitable relief . . . against . . . Jacoby [nor] to any injunctive relief or damages" against Westinghouse.

*Decree affirmed.*