van Gestel, J.
This matter is before the Court on the application of the plaintiff, EMC Corporation (“EMC”), for a preliminary injunction against the defendant Doron Kempel (“Kempel”).[1]
BACKGROUND
Kempel first began working with EMC in the spring of 1998, on a consulting basis. For about three years prior thereto, Kempel served as Vice President of Sales and Marketing for Imedia Corporation (“Imedia”). Imedia was a privately held company, based in San Francisco, that developed and sold video compression *132 and statistical multiplexing technology. In his position with Imedia, Kempel developed an expertise in a field known in the information technology industry as “rich media.” Rich media refers to video, audio, and imaging, as contrasted with plain digital consisting of text and numbers.
Based upon his expertise in video and related markets and given his contact base with customers in this space, Kempel provided EMC with consulting services regarding video-related products that EMC had under development — in particular, a video server and video compression technology. His role, among other things, was to evaluate the projected market for rich media; determine what EMC would have to do to retain its leadership position in the overall data storage marketplace, given the assumption that rich media would, in the future, become a significant portion of the overall digital market; and recommend an implementation strategy.
Kempel ultimately recommended that EMC establish a new, independent business unit that would focus solely on the rich media markets, and that this unit should lead and orchestrate all EMC’s activities in that space. His recommendations were accepted fully, and Kempel was asked by EMC to become a full-time employee and lead the implementation of his proposed strategy. Specifically, EMC asked him to assume the role of a general manager and establish a new business unit that would operate as an autonomous organization, sheltered from EMC’s core sales, marketing, engineering and other mainstream divisions. The new unit was called the Media Solutions Group (“MSG”).
Kempel reported directly to EMC’s head of engineering, Moshe Yanai (“Yanai”), and to the head of EMC’s Business Development. MSG had a separate budget and was managed by Kempel as an independent profit and loss center.
Kempel was not a mid-level manager but rather a highly compensated high-level executive employee having received about $2 million in economic rewards in the past two years. In his position he had access to a broad range of significant and confidential strategic EMC business and product information.
Upon joining EMC as a full time executive employee, Kempel executed the EMC Key Employee Agreement (the “Agreement"). Among other things, the Agreement provides:
1. Non-Competition . . . For the twelve-month period following the effective date of your termination, for any reason, from the Company, you agree not to directly or indirectly compete with the Company in any manner, including but not limited to directly or indirectly developing, producing, marketing, soliciting or selling products or services being developed, produced, marketed or sold by the Company as of the date of your termination. For purposes of the immediately preceding sentence you shall not be considered to be competing with the Company unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policy-making position with the competing enterprise.
7. Miscellaneous . . . (d) You agree that any breach of this Agreement will cause immediate and irreparable harm to the Company not compensable by monetary damages and that the Company will be entitled to obtain injunctive relief, in addition to other relief in any court of competent jurisdiction, to enforce the terms of this Agreement.
(e) No failure by the Company to insist upon strict compliance with any of the terms, covenants, or conditions hereof, and no delay or omission by the Company in exercising any right under this Agreement, will operate as a waiver of such terms, covenants, conditions or rights . . .
The Agreement is said to be “governed by and construed in accordance with the laws of the Commonwealth of Massachusetts ...” The Agreement also contains provisions regarding customer and vendor confidentiality and confidentiality of company records.
Kempel was contacted at some time prior to August of 2001 by a start-up company called SANgate Systems, Inc. (“SANgate”), or investors on its behalf, who were apparently seeking to find a person to become its chief executive officer. At that time, the situation at EMC was changing in ways that caused Kempel concern about the future of his MSG venture. He began to pursue with EMC changes in his position and let it be known that he would consider leaving EMC unless he was given an alternative position that would meet his career aspirations.
At one time during .this period. Kempel told his superior, Moshe Yanai, that he was considering joining SANgate if things could not be worked out for him at EMC. Yanai later, but unofficially, provided Kempel with a note or memorandum dated “8/20/01" that reads in its entirety:
To: Doron Kempel
From: Moshe Yanai
Subject: Your Leaving of EMC
I am very sorry to hear about your intentions to leave EMC and see it as a great loss for us. I still hope that you will change your mind at the last minute and would not leave us.
You also inquired about your intention that if you leave us you will move to be the CEO of SANGATE corporation. Per my knowledge about their work, I don’t see it as a problem to EMC.
Moshe
/s/ Moshe Yanai VP ENGINEERING
*133 It was later in. the day on August 20, 2001, that Kempel was advised by EMC that it would not be able to create for him a position of the kind that he sought. When given that advice by EMC’s Chief Executive Officer, Kempel handed him a letter of resignation, outlining that his last day of employment at EMC would be on September 2nd or 3rd. Later, on that same day, Kempel signed an agreement accepting a position with SANgate as its CEO and Chairman.
On the following day, August 21, 2001, Kempel was advised by General Counsel for EMC that EMC viewed SANgate as a competitor and that he would be in violation of his non-competition clause if he were to join SANgate as Chairman and CEO.
In his affidavit filed in this matter — from which much of the foregoing information has been taken— Kempel says at paras. 26 and 27, among other things:
26. As Chairman and CEO at SANgate I am expected to devise a strategy, establish an organization that will develop, sell and support certain information technology products (described below, and in more detail in the Affidavit of Alex Winokur) through a series of alliances with product and services companies.
27. SANgates’s router/switch-like product will address the Enterprise market place, offering complementary performance and interoperability enhancements to existing architectures and products. Generally speaking, this product will enable a company to network its storage devices, supporting SANgate and/or third party software applications, including the functionalities of point in time copying, data migration, and mirroring, using multiple vendors’ storage systems.
EMC designs, manufactures, markets and supports a wide range of computer storage-related hardware, software and service products. EMC’s systems, software and services store, manage, and retrieve data from all major computing platforms, including mainframe and open systems environments, and allow for common management, protection and sharing of information.
According to the affidavit of David A. Donatelli, Senior Vice President of Corporate Marketing and Business Development at EMC, data storage systems must be able to operate reliably around the clock. Storage solutions that meet this need have been described as “mission critical” storage systems. Fundamental to any effective mission critical storage solution is the ability (1) to copy data to remote facilities for disaster recovery purposes (“remote mirroring”); (2) to make multiple copies of data within one storage unit for back-up purposes (“point-in-time copying”); and (3) to move data from one location to another without disrupting normal business operations or data availability (“data migration”).
Donatelli affirms that EMC offers products that allow for remote mirroring (“Symmetrix Remote Data Facility”), for point-in-time copying (“TimeFinder” and “Snap View”), and for data migration (“Symmetrix Data Migration Services”).
It is in the software for information storage, not the information storage systems themselves, that EMC and SANgate bump into each other. According to EMC’s most recent Form 10-Q filing with the Securities and Exchange Commission, its information storage software business increased from $620,245,000 for the six months ended June 30, 2000, to $965,057,000 for the six months ended June 30, 2001. While relatively small in the overall business for EMC, it is hardly a casual side effort.
Although SANgate does not yet have any product ready for sale, it is developing a system called the Enterprise Storage Appliance (“ESA”). In its Internet web page, SANgate says: “The SANgate ESA enables you to perform remote mirroring, point-in-time copying and data migration using any vendor’s storage subsystem.”
In an article from Computerwire dated July 9,2001, also featured on SANgate’s web page, and not disputed by SANgate, it is said:
In the first quarter next year, Sangate — founded in May 1999 and backed with $18.25m financing in two rounds — says it will ship a radical appliance which will allow remote mirroring, point-in-time copying and data migration across any combination of IBM Shark, Hitachi Lightening and EMC’s Symmetrix or Clariion storage arrays.
Sangate will also relieve EMC’s customers of the need to buy EMC’s somewhat expensive software for the key tasks of mirroring, migration and point-in-time copying.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, EMC bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Kempel and SANgate from Kempel’s being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Before assaying these issues, it is appropriate to canvass the relevant elements of the Massachusetts law dealing with the enforcement of non-competition and confidentiality agreements.
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant *134 here, the good will the employer has acquired through dealings with its customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
Kempel’s position at EMC was sufficiently high that EMC has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition and other covenants of the Agreement with Kempel. The Agreement itself, in plain language, recites “that any breach . . . will cause immediate and irreparable harm to [EMC] not compensable by monetary damages and that [EMC] will be entitled to obiain injunctive relief.”
A non-competition agreement, however, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., Blackwell v. F.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975); All Stainless, Inc., supra, 364 Mass. at 779-80; Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355(1933). Here, the scope and the one-year time limit involved in the EMC Agreement are certainly reasonable for the protection of the matters in issue. Blackwell, supra, 368 Mass. at 229; Marine Contractors Co., Inc., supra, 365 Mass. at 289.
The principal issue that must be examined is whether Kempel, on the record before this Court, is violating the non-competition part of the Agreement. The Agreement’s plain language becomes critical. Here, the Court observes that the word “compete” is broadly defined by the directly following words: “including but not limited to directly or indirectly developing, producing, marketing, soliciting or selling products or services competitive with products or services being developed, produced marketed or sold by [EMC] at the time of your termination.” (Emphasis added.) With the inclusion of the word “developing,” it is not necessary for EMC to show that SANgate has a product that competes with those of its own or that those of its own are in a state beyond “being developed.” Rather, the fact that SANgate is developing a product that competes with one being developed by EMC is enough to ensnare Kempel.
Kempel argues in his supplemental affidavit that he did not work on or know about any product at EMC that competes with any proposed product at SANgate. This misses the point however. The Key Employee Agreement prohibits, among other things, “directly or indirectly compet[ing] with [EMC] in any manner, including but not limited to directly or indirectly developing . .. products or services competing with products or services being developed, produced, marketed or sold by [EMC] as of the date of [his] termination.” Kempel, by the limiting language of the Agreement, would not be considered competing unless he held an officership, directorship or other policy-making position “with the competing enterprise.” It is, thus, what SANgate — "the competing enterprise" now under Kempel’s leadership) — is doing, not what Kempel did at EMC, that is critical.
Kempel also argues that a new EMC product called “AutoIS” — which he implies does compete with SANgate’s anticipated ESA product — was not announced and available for sale until October 29, 2001. Consequently, Kempel argues that this is after the “date of his termination” and, therefore, not reached by the Agreement. Kempel’s proffer is a press release by EMC stating, among other things, that “EMC began delivering major elements of AutoIS [on October 29, 2001].” Again the Court must focus on the language of the Agreement relating to products being “developed” by EMC on the date of Kempel’s leaving. If AutoIS was being delivered to customers on October 29, 2001, of necessity it must already have been developed and marketed well before that date. The Court, of course, does not know when the development or marketing of AutoIS started at EMC, but it would be surprised to learn that it began after August 31, 2001, less than two months before the first deliveries to customers.
On the issue of “competition” the Agreement also has a clear and definite exclusion. It reads: ”[Y]ou shall not be considered to be competing with [EMC] unless you have an ownership interest amounting to at least 1% in the competing enterprise (whether direct or indirect by way of stock options (vested or unvested) or otherwise) or an officership, directorship or other policy-making position with the competing enterprise.”
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation, supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent *135 with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Key Employment Agreement in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr, supra, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
Here, where EMC, a sophisticated and knowledgeable entity, chose to embody its relationship with its key employees in a detailed and carefully crafted written instrument, perhaps more than in other situations it is entitled to and should be held to the contractual language it chose. Similarly, Kempel is not unsophisticated, and he too must be held to the same kind of contractual interpretation. Nor, of course, can SANgate effectively plead its innocence of the reach of the language in Kempel’s Agreement with EMC. The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify its expressed statements. “Courts cannot . . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
Contracts drafted by employers to limit the employment prospects of former employees — even those at a very high level — must be construed narrowly against the employer. Sentry Ins. Co. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982). At the same time, clear language must be given a clear application.
Here, in order to be considered competing — using EMC’s own language — Kempel must have “an ownership interest amounting to at least 1% in” SANgate “or an officer ship, directorship or other policy making position with” SANgate. As Chairman and CEO of SANgate, Kempel is clearly in “an officership ... or other policy making position with” SANgate. There is no one in a higher position at that company than Kempel.
As is apparent above, EMC and SANgate are competitors for the purpose of Kempel’s Agreement. They each are developing, and EMC is marketing, software for point-in-time copying, data migration, and remote mirroring applications for use in data storage systems.
There are other elements to the Key Employee Agreement that seem entitled to enforcement as well. The Court speaks of the provisions relating to customer and vendor confidentiality and to the confidentiality of EMC’s materials. EMC has demonstrated that it is entitled to protection on these issues.
Kempel agreed “not to use or disclose any . . . customer or vendor information” and to “return all such materials to” EMC. Further, he agreed not to use for his own benefit, divulge or disclose to anyone, “any information not available to the public” concerning EMC or any of its customers or suppliers, all as outlined in Section 3 of the Key Employee Agreement.
Kempel and SANgate plead hardship should this Court enjoin Kempel from acting as SANgate’s Chairman and CEO for the balance of the year from the date he voluntarily chose to leave EMC to enhance his career aspirations. Kempel was not fired by EMC, nor was he taken off the MSG project that produced his $2 million dollar compensation over the past two years. Kempel will lose his job at SANgate for a little over nine months, and SANgate will lose Kempel as its Chairman and CEO for the same period. Until August 31, 2001, each of Kempel and SANgate survived without the other — Kempel exceedingly well, it appears, and SANgate, with $18.25 in venture capital money, not too badly, either.
The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable.
Marine Contractors Co., Inc., supra, 365 Mass. at 289.
Nor, as Kempel and SANgate argue, were this case and its application for a preliminary injunction brought too late. The Agreement itself addresses this very issue in Section 7(e). Further, with (1) Kempel leaving EMC on August 31, 2001, (2) SANgate issuing its press release announcing his hiring as Chairman and CEO on September 24, 2001, and (3) suit having been filed on October 10, 2001, even absent the contractual provision excusing any delay, no argument can be made that the request for injunctive relief came too late.
Lastly, the Court is wholly unconvinced that the August 20, 2001 note/memorandum from Moshe Yanai to Kempel can be elevated to the level of a waiver by or estoppel against EMC in proceeding as it is. Nothing in Yanai’s note demonstrates that he was speaking for EMC, that he knew all there was to know about competition between EMC and SANgate in the development area, or that he understood the legal *136 reach of the non-competition aspects of the Agreement. This is not meant to criticize Yanai, but rather to reflect that this Court must act on the law which may or may not have been known to him at the time he penned the note.

CONCLUSION

For the foregoing reasons, this Court enters the following preliminary injunction:
The defendant Doron Kempel is preliminarily enjoined and restrained from having any employment relationship with SANgate Systems, Inc. as an officer, director or in any other policy-making position until August 31, 2002, or until any further order of this or any appellate Court, whichever first occurs.
The defendant Doron Kempel is hereby further enjoined and restrained from using or disclosing any customer and vendor information of EMC Corporation to any person, firm or entity and from divulging or disclosing to any person, firm or entity, any information not already lawfully available to the public concerning EMC Corporation or any of its customers or suppliers, including any products, product development, business strategy, financial information, or customer or employee lists, technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product, specification, or plan for a new, revised or existing product, or any business plan, marketing, financial or sales order, or the present and future business or products of EMC Corporation.
The foregoing preliminary injunction shall remain in full force and effect until further order of this or any appellate court.

 SANgate Systems, Inc. has been permitted to intervene in this action as a party defendant.