van Gestel, J.
This matter is before the Court on a substitute motion by the plaintiff, Securitas Security Services USA, Inc. (“Securitas”), seeking preliminary injunctive relief against the defendant, Kenneth Jenkins (“Jenkins”).
BACKGROUND
At the time he voluntarily resigned his employment at Pinkerton’s, Inc. (“Pinkerton’s”) on June 12, 2003, Jenkins held the position as Region President of the New England Region of Pinkerton’s Security Services Division. He was veiy well paid in this position. Indeed, for the period from January 2000, until his resignation in June 2003, Jenkins earned nearly $2 million in gross compensation.
Pinkerton’s Security Services Division was in the business of providing uniformed security guard services to businesses in return for a fee.
Jenkins has been in the security business, principally in Massachusetts, but also in the rest of New England, continuously since he started with a company called First Security Services, Inc. (“First Security”) in 1974. At First Security, Jenkins rose from a position as an entiy level investigator to Senior Vice President and Chief Operating Officer.
In January 2000, Pinkerton’s acquired First Security and Jenkins accepted employment with Pinkerton’s. His first job at Pinkerton’s was as Senior Vice President of the New England Region.
In 1999, Securitas AB, a leading international security provider based in Stockholm, Sweden, entered the U.S. security market by acquiring Pinkerton’s and continued this effort in 2000 by acquiring six other American security companies.
There is some considerable confusion in the record before the Court regarding the corporate interplay between Pinkerton’s and Securitas. At least until Jenkins’s resignation on June 12, 2003, it appears that Pinkerton’s, Inc., a Delaware corporation, was in existence. However, it is stated in the Affidavit of James H. Fox, described as Vice President, Deputy General Counsel for Securitas and formerly Vice President, Deputy General Counsel for Pinkerton’s since 1999, that “(e)ffective July 1, 2003, Pinkerton sold substantially all of its assets and liabilities to Securitas USA.”[2] Mr. Fox also avers that “(a]s part of the transaction described . . . above, Securitas USA has succeeded to the rights and obligations of Mr. Jenkins’s 2002 Agreement.” The Agreement referred to is discussed below in greater detail.
No evidence of any assignment was presented, other than the statement in Mr. Fox’s Affidavit, and Jenkins, in his own opposing Affidavit, denies that he ever assented to any such assignment.
Pinkerton’s corporate structure changes become blurred by statements made in a form letter dated “June 2003,” to be sent to Pinkerton’s customers and prepared for Jenkins’s signature as “Region President, Securitas New England Region.” The first three paragraphs of the letter read as follows:
An exciting new day is here! It is with great pleasure and much anticipation, that I formally introduce you to Securitas Security Services USA, Inc.
As you probably know, Securitas AB is a leading international security provider based in Stockholm, Sweden. Securitas entered the U.S. security market in 1999 by acquiring Pinkerton’s, Inc. and continued this effort in 2000 by acquiring Burns International, First Security, American Protective Services, Doyle Protective Services, Smith Security and APG Security.
Since Securitas AB’s entrance into the U.S. security market in 1999, great thought has been given to the goal of becoming the leading U.S. provider of security services. As part of this goal, we have been diligently working through the process of unifying our two major operating brands — Pinkerton and Burns International — under a single identity. On July 1, 2003, we will take a significant and exciting step, when we commence the operation of Pinkerton and Burns International under a single unified company, which will be known as Securitas Security Services USA, Inc.
As observed in footnote 2, this Court does not truly know what happened, and when, with regard to the ongoing existence of Pinkerton’s as a corporate entity. For example: was Pinkerton’s stock or assets and liabilities acquired by Securitas AB in 1999; were Pinkerton’s assets and liabilities acquired on July 1, 2003, by Securitas Security Services USA, Inc.; does Pinkerton’s still exist; was there just a change in Pinkerton’s corporate name; or did something else happen? For purposes of the present situation, there being no solid evidence to the contrary, the Court will assume that Pinkerton’s corporate existence continued after Jenkins resigned, at least until July 1, 2003.[3]
While at Pinkerton’s, Jenkins always had a form of written employment agreement. The most recent of those agreements, all of which are similar but not identical in all respects, is dated February 26, 2002 (the “Agreement”). The Agreement contains trade secrets, confidentiality, non-competition and non-solicitation of customer and employee provisions. They read as follows:
(a) Trade Secrets/Confidentiality/Non-Competition: In view of the unique nature of your employment *488 with the Company as a high level executive, you have and will continue to become aware of, and have extraordinary access to, the Company’s particular business strategies, financial plans, customer lists and information, pricing models, trade secrets (as defined in the Uniform Trade Secrets Act) and other confidential information (collectively referred to as “confidential information”). You agree that you shall not reveal to anyone (other than the Company or persons employed or designated by the Company) any of the Company’s confidential information. You further agree to not disclose, publish or make use of any such confidential information without the prior written consent of the Company. You further agree that for one year after any termination of the employment relationship with the Company you shall not engage in activities which directly or indirectly compete with the Company’s business operations.
(b) Non-Solicitation of Company Customers and Clients: You agree that for one year after any termination of the employment relationship with the Company, you shall not engage in any activities designed or intended to cause any Company customer or client to stop doing business with the Company, to start doing business with a competitor of the Company or to reduce the amount of business which a customer or client engages in with the Company.
(c) Non-Solicitation of Company Employees: You agree that for one year after any termination of the employment relationship with the Company, you shall not engage in any activities designed or intended to cause any Company employee to terminate his or her employment with the Company.
Included after the three sections of the Agreement just quoted is the following:
You further agree that if you engage in any of the prohibited activities contained in Sections (a), (b) or (c) of the Trade Secrets/Confidentiality/Non-Competition/Non-Solicitation provisions of this Agreement, the Company shall be released from any obligation to pay or provide severance benefits to you or to make any LTIP payments to you.
Jenkins resigned from his position as Region President of Pinkerton’s New England Region to accept a position as President and Chief Operating Officer of Apollo Security, Inc. (“Apollo”), a direct competitor of Pinkerton’s and Securitas in New England. Jenkins avers in his Affidavit that Securitas, in the New England security market, is ten times larger than Apollo. Jenkins says that at Apollo he was offered the opportunity to acquire an ownership interest in the business, which was not available to him at Pinkerton’s. Further, Jenkins asserts that he was hired by Apollo to “guide the business as [the present owner] became less involved while, at the same time, training [the present owner’s] son to take over management of the business in 10 years or so.”
It is in this context that the Court considers the request for preliminary injunctive relief by Securitas against Jenkins.
DISCUSSION
In order to prevail on its request for preliminary injunctive relief, Securitas bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Jenkins from being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
The legal history of these kinds of agreements dates back at least to Lord Macnaughten, in England in the late 19th century. In Nordenfeldt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535 at 565, Macnaughten reminded his readers that enforcement of these kinds of agreements is an exception to the general rule when he said:
The public have an interest in every person’s carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable — reasonable, that is, in reference to the interest of the parties concerned and reasonable in reference to the interest of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public. That, I think, is the fair result of all of the authorities.
Massachusetts adopted Lord Macnaughten’s statement at least as early as 1922. See Sherman v. Pfefferkorn, 241 Mass. 468, 474 (1922).
The law more recently has been recited as follows:
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with its customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for *489 that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
Jenkins’s position at Pinkerton’s was sufficiently high that Pinkerton’s has a justifiable interest beyond that of just ordinary competition in seeking to enforce the non-competition and other covenants of the Agreement with Jenkins.
A non-competition agreement, however, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975); All Stainless, Inc., supra, 364 Mass. at 779-80; Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355 (1933). Here, the scope and the one-year time limit involved in the Agreement are certainly reasonable for the protection of the matters in issue. Blackwell, supra, 368 Mass. at 229; Marine Contractors Co., Inc., supra, 365 Mass. at 289.
In short, but for the two issues discussed below, Jenkins’s resigning from Pinkerton’s to accept the position of President and Chief Operating Officer of Apollo would be a clear and direct violation of the non-competition aspects of his Agreement.
The first of the two issues relates to the nature of the Agreement. The Court focuses on the paragraph following the three trade secrets/non-competition/non-solicitation paragraphs which reads;
You further agree that if you engage in any of the prohibited activities contained in Sections (a), (b) or (c) of the Trade Secrets/Confidentiality/Non-Competition/Non-Solicitation provisions of this Agreement, the Company shall be released from any obligation to pay or provide severance benefits to you or to make any LTIP payments to you.
Contracts drafted by employers to limit the employment prospects of former employees — even those at a very high level — must be construed narrowly against the employer. Sentry Ins. Co. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982).
The non-competition aspects of Jenkins’s Agreement with Pinkerton’s appears to this Court to be a forfeiture-for-competition clause. As such it does not absolutely proscribe competition by Jenkins. It merely makes it economically costly for him to do so. Of course, Massachusetts courts must apply the same test of reasonableness to a forfeiture-for-competition clause as to a non-competition clause. See, e.g., Cheney v. Automatic Sprinkler Corp. of America, 377 Mass. 141, 143-47 (1979).
The second, and more significant, issue standing in the way of preliminary injunctive relief on the record before the Court relates to the question of assignment of Jenkins’s employment Agreement from Pinkerton’s to Securitas. As noted above, Jenkins has stated in his Affidavit that he never agreed to such an assignment. “(E]veiy one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent.” New England Cabinet Works v. Morris, 226 Mass. 246, 250 (1917).
Here, Jenkins agreed with Pinkerton’s, not Securitas, to serve as Pinkerton’s Region President for New England.
[WJhen rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract.

Id.

In his Agreement, Jenkins was obligated to: fully run the New England Region following “the policies and procedures of’ Pinkerton’s; to earn his substantial bonus by achieving goals set in Pinkerton’s “2002 business plan”; have rights to Pinkerton’s restated and amended 2002 and 2006 Long-Term Incentive Plans; to participate in Pinkerton’s retirement and benefit plans; to have an automobile allowance consistent with Pinkerton’s “policy for employees at the Region President” level; and be an at-will employee of Pinkerton’s. There was no showing that identical obligations and benefits were available to Jenkins from Securitas or that he would choose them from Securitas if offered.
Yet another, and possibly quite significant, reason for not permitting assignments of these kinds of agreements without assent is the fact that Jenkins, knowing the character and personality of Pinkerton’s, might be ready and willing to safeguard the trust which it imposed in him by granting a restrictive covenant against leaving his employment. This does not mean, however, that Jenkins would have been willing to suffer this same restraint for the benefit of a stranger to the original undertaking.
Certainly Jenkins could not assign his contract with Pinkerton’s to serve as its Region President for New England without Pinkerton’s assent. For similar reasons Pinkerton’s could not assign Jenkins’s employment agreement to another corporate entity without Jenkins’s assent.
There is nothing in Adamowicz v. Iwanicki, 286 Mass. 453 (1934), cited by Securitas, that involved a covenant not to compete given in connection with the sale of a meat and grocery store business, that is contrary to the proposition in New England Cabinet Works relating to the need for assent of the employee to an assignment of his employment agreement.
Respectfully, also, this Court disagrees with the suggestion by Securitas that the holdings by two trial *490 courts in New York and New Jersey[4] should be imposed on the present situation. To do so would have the result of adding and changing language to Jenkins’s Agreement with Pinkerton’s. He did not contract not to compete with Securitas, or to keep confidential Securitas’s trade secrets or other information, or to not solicit Securitas’s customers or employees. Jenkins’s Agreement relates to Pinkerton’s as a competitor and to Pinkerton’s trade secrets, customers and employees.
“It is not the role of the court to alter the parties’ agreement.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Courts cannot directly add language to contracts that the parties did not choose to include even if necessary to permit the contract to become operative, and they should not do so in the manner suggested in the New York and New Jersey cases either.[5]
ORDER
For the foregoing reasons, Securitas Security Services USA, Inc. has not shown that it has any rights to enforce the February 26, 2002 agreement between Kenneth Jenkins and Pinkerton’s, Inc. and consequently it has not shown the requisite likelihood of success on the merits. The request for preliminary injunctive relief is, therefore, DENIED.
This denial is not to be read in any way as the law of this case, nor is it intended to bind any arbitrator or panel of arbitrators who may hereafter determine the merits of this case on a more complete record on all aspects thereof.

ALL FURTHER PROCEEDINGS IN THIS CASE ARE HEREBY STAYED PENDING COMPLETION OF ARBITRATION.

The Court was not provided with any documentation regarding this transaction and, thus, only knows what little was presented by the parties.

Jenkins’s most recent employment agreement with Pinkerton’s contains an arbitration clause, broadly worded, to include “[a]ny dispute or controversy arising from this Agreement, or your employment. . .” Presumably, the corporate maneuvers can be sorted out in the arbitration hearings.

Norman Ellis Corp. v. Lippus, 13 Misc.2d 432, 176 N.Y.S.2d 5 (1955), and A. Fink & Sons, Inc. v. Goldberg, 101 N.J.Eq. 644, 139 A. 408 (1927).

While no Massachusetts cases have been found on the point, several other courts have refused to cut up personal service contracts and allow portions thereof to be assigned in the manner suggested. See, e.g., All-Pak, Inc. v. Johnston, 694 A.2d 347, 351-52 (Pa.Sup.Ct. 1997); Reynolds and Reynolds Co. v. Hardee, 932 F.Sup. 149, 155 (E.D.Va. 1996), aff'd., 133 F.2d 916 (4th Cir. 1997); Smith, Bell & Hauck, Inc. v. Cullins, 123 Vt. 96, 101-02 (1962).