Billings, Thomas R, J.
For the following reasons, the plaintiffs motion for preliminaiy injunction[1] is DENIED.
BACKGROUND
The Verified Complaint alleges that the plaintiff (“KNF&Tj is a staffing agency that places personnel in certain fields for temporary or permanent employment in the Boston area. It has offices in Boston and Westboro. Defendant Muller is a former employee. She was hired in May 2005, having no prior experience in the field, and resigned effective April 12, 2013. In the intervening eight years she received several promotions and increases in compensation; by the end, she was a Vice President and manager of the company’s Boston temporary staffing division, its largest and most profitable business unit. Muller was also in charge of the company’s largest account. She had *562 substantial contact with the employers who used KNF&T’s services, and the applicants whom KNF&T placed.
Muller left KNF&T to work for Iron Mountain in its human resources department. In early September 2013 she moved again, this time to take a job with defendants Panther Global Group, Inc. and its subsidiary, Total Clerical Services, Inc. (collectively, “Panther”). Panther is a staffing firm headquartered in Boston and is, in some areas but not all, directly competitive with KNF&T.[2]
Upon beginning her employment with KNF&T, Muller signed an Employee Confidentiality and Non-competition Agreement. This contained certain employment and post-employment covenants, but did not address such matters as title, duties, or compensation.
In addition to a fairly standard restriction on Muller’s use and post-employment possession of KBF&T’s confidential information and trade secrets, the Agreement had the following paragraph:
2. Non-Competition. The Employee agrees that while the Employee is an employee of the Company and for a period of one year from and after the date on which, for any reason, the Employee ceases to be an employee of the Company, the Employee shall not (other than on behalf of the Company): (i) engage in any activity involving personnel placement (whether such placement is on a permanent or temporary basis) in the Company’s Fields of Placement (as hereafter defined), either directly or indirectly or as a representative or employee, officer, director, stockholder or partner of another person or business organization, within a geographic area which lies within a fifty (50) mile radius of any existing or proposed office of the Company or any affiliate thereof or (ii) solicit, recruit or hire away other employees, including temporary employees, of the Company or any affiliate thereof. Proscribed activity shall include either operating from a place or business or making placements at worksites within the aforesaid geographical area. For purposes of this Covenant, the “Company’s Fields of Placement” shall mean the placement of administrative and office support staff and any other categories of personnel regularly placed by the Company or its affiliates as of the date of the Employee’s termination of employment, including without limitation the placement of clerical, secretarial, legal secretarial/paralegal, bookkeeping, accounting/finance, and human resources personnel. It is further agreed that this covenant is divisible both as to duration and geographical extent and may be enforced for such time or in such area as may be determined reasonable by a court of competent jurisdiction.
In Paragraph 3, the parties agreed that KNF&T would be entitled to enforcement of the agreement “by injunc-tive court order.” So far as appears in the papers, the enumerated “Fields of Placement” remain an accurate delineation of KNF&T’s business today.
Two recent events have drawn KNF&T’s attention back to its former employee. The first was the news that in about August of this year, Muller recommended a former colleague at KNF&T to a potential employer, John Hancock Financial Services. The colleague, Jillian Ciarletta, had in fact taken over Muller’s old position as manager of the Boston temporary staffing division. Hancock contacted Ciarletta by email, dangling before her “a few very exciting, new recruiting opportunities at John Hancock” and mentioning Muller’s reference. Ciarletta did not take the bait, however, and still works for KNF&T, which regards Muller’s role in the episode as a breach of her non-solicitation covenant.
The second event occurred shortly after Muller began work for Panther. KNF&T learned from a client, Atlantic Trust, that Muller had contacted it, informed it of her new employment, “and inquired about referring potential employees to Atlantic Trust, in direct violation of her obligations under her Employment Agreement.” (Verified Complaint, ¶16.)
Muller has submitted an affidavit in which she admits having spoken informally to a friend at Atlantic Trust, and elaborates:
I mentioned to my friend that I recruited IT employees at [Panther], because it was outside of KNF&T’s fields of placement. Neither I nor [Panther], however, have done any business with Atlantic Trust since my employment commenced, and neither I nor [Panther] have had any contact with Atlantic Trust after the conversation described herein.
Nothing in the papers contradicts Muller’s version of this event.
DISCUSSION
The nature of the proceedings on a motion for preliminary injunction, and the standard for its issuance, are familiar:
By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law. On the basis of this record, the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits. Should the injunction issue, however, the enjoined party may suffer précisely the same type of irreparable harm. Since the judge’s assessment of the parties’ lawful rights at the preliminary stage of the proceedings may not correspond to the final judgment, the judge should seek to minimize the “harm that final relief cannot redress,” by creating or preserving, in so far as possible, a state of affairs such that after the full trial, a meaningful decision may be rendered for either party.
*563 Therefore, when asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party’s claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.
Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
Employee covenants not to compete “are scrutinized with particular care because they are often to product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Sentry Ins. Co. v. Fimstein, 14 Mass.App.Ct. 706, 707 (1982); see Alexander v. Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 496 (1986) (close scrutiny warranted because “an... employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer”). Such covenants generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961). Such legitimate business interests might include trade secrets or other confidential information, or the good will the employer has acquired through dealings with its customers. See Ail Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974). Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros., Inc. v. WestinghouseBroadcast. Co., Inc., 357 Mass. 106, 111 (1970); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
In this case, KNF&T has made the case for the “good will” justification for a post-employment restraint.[3] Also, the terms of the covenant itself are, under the standards suggested in the Massachusetts cases, well within reason as to time (one year), space (50 mile radius), and prohibited conduct (recruiting only in the fields in which KNF&T itself recruits). See Marine Contrs. Co. v. Hurley, 365 Mass. 280, 287-90); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). I assume, for present purposes, that Muller’s promotions, and the corresponding increases in responsibility and compensation, did not constitute abandonment of the covenant under the doctrine of F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585, 587-88 (1968).[4]
The evidence that Muller has violated—or that she necessarily will violate—the covenants in her agreement with KNF&T, however, is somewhere between veiy weak and nonexistent. Giving a former colleague’s name to a potential employer with which Muller was not affiliated did not constitute “solicit[ing], recruit[ing] or hir(ing) away” the former colleague. Muller did not contact Ciarletta, try to persuade her to leave KNF&T, or offer her a job. There was therefore no violation of the non-solicitation clause, construed according to ordinary English usage and the probable intent and reasonable understanding of the parties. See Hurtubisev. McPherson, 80 Mass.App.Ct. 186,190 (2011) and cases cited.
The conversation -with the friend at Atlantic Trust comes closer—if only because it calls to mind the image of the camel’s nose under the tent—but still falls short of the mark. Quite simply, Muller was not and is not prohibited from soliciting or accepting any potential client—whether or not it is a present client of KNF&T—for recruitment of IT professionals, or anyone else in a field in which KNF&T does not recruit.[5]
There is thus no evidence of a past or present violation. Nor, given the breadth of Panther’s recruiting business, is there reason to regard a future violation in the five and one-half months remaining on the restriction as inevitable or even particularly likely, particularly by sophisticated parties who have now had a shot fired across the bow.
KNF&T thus has not demonstrated a likelihood of success on the merits (see Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001)), making it unnecessary to examine the balance of harms or, in this dispute among private parties, the public interest.
ORDER
For the foregoing reasons, the plaintiffs motion for preliminary injunction is DENIED.

The motion, styled as a motion for temporary restraining order, was filed with the Complaint on October 16, 2013. Rather than rule ex parte, I issued a short order of notice, returnable a week later on October 23, 2013. The defendants filed an opposition and both sides appeared at the hearing through counsel. I have therefore treated the motion as a request for a preliminary injunction.

From the materials submitted, it appears that KNF&T places applicants in administrative and office support, clerical, secretarial, legal secretarial/paralegal, bookkeeping, accounting/finance, and human resources positions. Panther places applicants in many of these fields, and also in design, electrical, and mechanical engineering; information technology; customer service; MSP and VMS programs; payroll plans; on-premises vending; and certain positions with Latin American employers.

KNF&T also presumably has lists of applicants and employers which would qualify as protected confidential information. It does not allege that Muller took any such lists with her, however, and I assume here that she did not. A list of *564 applicants in the fields in which KNF&T recruits would not be very useful to a recruiter in other fields; bookkeepers, for example, do not readily become mechanical engineers overnight. Nonetheless, both the covenant and the common law would prohibit her taking with her a customer list or other confidential information in tangible form. See Woolley’s Laundry, Inc. v. Silva, 304 Mass. 383, 387 (1939).

interpretation of the Bartlett holding has largely been left, thus far, to the trial courts, whose treatment of it has not been wholly uniform. The broadest restatement of the doctrine is that “[e]ach time an employee’s employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.” Iron Mountain Information Mgmt., Inc. v. Taddeo, 455 F.Sup.2d 124, 132-33 (E.D.N.Y. 2005), quoting Lycos, Inc. v. Jackson, 18 Mass. L. Rptr. 256, 2004 WL 2341335 (Mass.Super. 2004; Houston, J.). Numerous other cases have held that a material change in terms—but especially, a pay cut, demotion or material breach by the employer, and especially if the employee was tendered a new covenant and refused to sign—abrogated the original covenant. AFC Cable Sys. v. Clisham, 62 F.Sup.2d 167, 173 (D.Mass. 1999) (changes in terms plus refusal to sign new covenants); In-tepros, Inc. v. Athy, 31 Mass. L. Rptr. 144, 2013 WL 2181650 (Mass.Super. 2013; Curran, J.); Protege Software Services, Inc. v. Colameta, 2012 WL 3030268 (Mass.Super. 2012; Kirpalani, J.) (material breach); Grace Hunt IT Solutions, LLC v. SIS Software, LLC, 29 Mass. L. Rptr. 460, 2012 WL 1088825 (Mass.Super. 2012; Lauriat, J.) (change in terms and refusal to sign); R.E. Moulton, Inc. v. Lee, Mass. L. Rptr. 157, 2004 WL 1894910 (Mass.Super. 2004; Kottmyer, J.) (demotion); Cypress Group, Inc. v. Strides & Associates, 17 Mass. L. Rptr. 436,2004WL616302 (Mass.Super. 2004; Burnes, J.); Lantor, Inc. v. Ellis, 1998 WL 726502 (Mass.Super.; Gants, J.) (material breach). Contrast Leibowitz v. Aternity, Inc., 2010 WL 2803979 (U.S.Dist.Ct. E.D.N.Y., July 14, 2010) at *22 (no abrogation where non-compete agreement expressly stated, “Any subsequent change or changes in [employee’s] duties, salaiy or compensation will not affect the validity or scope of this Agreement”; applying Massachusetts law); A.R.S. Services, Inc. v. Morse, 2013 WL 2152181 (Mass.Super. 2013) (Leibensperger, J.) (similar); and Getman v. USI Holdings Corp., 2005 WL 2183159 (Mass.Super. 2005; Gants, J.) (change in salary and commission did not abrogate agreement which had not specified the rate for either).

The same reasoning applies to the evidence that Muller currently has a Linkedln profile disclosing her current employer, title, and contact information, and counting among her “Skills & Expertise” such things as “Internet Recruiting,” ‘Temporary Staffing,” “Staffing Services,” and “Recruiting.” There is no more specific mention of any of KNF&T’s “Fields of Placement” than this. So long as Muller has not and does not, prior to April 12, 2014, solicit or accept business in the Fields of Placement for herself or others (including her new employer), she will not have violated the covenant not to compete.