van Gestel, J.
This matter comes before the Court on a motion of the plaintiff, Sentient Jet, Inc. (“Sen *501 tient”), seeking certain preliminary injunctions against the defendants James E. Lambert, Jr. (“Lambert”), Donald E. Smith, Jr. (“Smith”) and Gregory P. Goodwin (“Goodwin”). Lambert, Smith and Goodwin are former employees of Sentient who have allegedly violated non-competition agreements by forming and working for a new company, the defendant EBJ Executive Business Jets, LLC (“EBJ”), in direct competition with Sentient, and by supposedly misappropriating hard copies of Sentient’s confidential and proprietary databases and other information to assist in their new venture.
The principal defense is that there have been significant changes in the defendants’ employment arrangements with Sentient such that the covenants in their agreements should no longer be enforced.

BACKGROUND

Sentient is in the business of providing charter jet aircraft services to corporations, corporate executives, high net worth individuals, celebrities and professional athletes. Prior to September 2002, Sentient wás known as “eBizJets” and “Executive Business Jets.” Sentient manages a network of over 1,400 charter aircraft and their FAA-certiñed operators and provides aircraft services for its clients. Sentient uses the TravelCard Membership program for frequent private jet flyers. It also offers on-demand services for clients who require less frequent private jet services or jet service without membership commitments.
Sentient has established relationships with at least 300 carriers which are entities that own or manage private aircraft for use in charter flights. These carriers provide the actual flight services sold by Sentient. Sentient has spent significant amounts of money and time in establishing and cultivating its relationships with its carriers. In so doing, it has created an extensive database of information regarding the carriers such as their contact persons, the types of aircraft available, pictures of these aircraft, flight history, potential rates, pilots’ identities and qualitative insights such as integrity, reliability and safety. Sentient claims that this is confidential and proprietary information, access to which Sentient restricts only to its employees.
Sentient has approximately 500 travel card accounts, covering over 1,000 members. These accounts include wealthy individuals, corporations, professional athletes and entertainers. Again, Sentient has spent considerable time and money identifying these accounts, and in establishing and cultivating relationships with them. Sentient has created a database for its accounts, much like that for its carriers. This account database includes information regarding the accounts such as contact information, e-mail addresses, iypes of accounts, number of times flown with Sentient, flight history, flight preferences, rates paid, and feedback. Sentient claims that this too is highly confidential and proprietary information to which Sentient restricts access only to its employees.
Sentient also has over 600 charter customers or potential charter customers who will purchase individual flights, as opposed to purchasing a membership. There is a database for these charter customers which contains information similar in kind to that for the account database. Again, it too is claimed by Sentient to be confidential, proprietary and limited in access to Sentient employees only.
Lambert was Sentient’s Director of Carrier Operations and as such was Sentient’s primary point of contact for the carriers. He was responsible for establishing, managing, and cultivating Sentient’s relationships with the carriers. As part of his job, he managed the database for the carriers.
Smith served as Sentient’s Director of National Accounts. He was responsible for identifying, acquiring and cultivating relationships with all of Sentient’s corporate accounts. He also managed the Sentient database for accounts. •
Goodwin served as Sentient’s Director of Charter Operations. He was its primary point of contact for the charter customers. As part of his job, Goodwin managed the content of the charter customer database.
Lambert, Smith and Goodwin each executed confidentiality and non-disclosure agreements with Sentient. The confidential information portions of those agreements reached: “any scientific, technical, trade or business secrets of [Sentient]” and any such information that Sentient treats “as confidential or proprietary.”
The non-competition covenants read:
During the term hereof and for a period of eighteen months after the termination or expiration of the Employee’s employment with [Sentient], for any reason or no reason, the Employee will not, directly or indirectly:
(a) as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor or lender, or in any other capacity whatsoever (other than as the holder of not more than one percent of the total outstanding stock of a publicly held company) engage in the business of providing jet chartering related content or services using the internet or otherwise;
(b) recruit, solicit or induce, or attempt to induce any employee of, or consultant to, [Sentient] to terminate their employment with, or otherwise cease their relationship with [Sentient].
The agreements also contain language whereby the employees agree that a breach would cause irreparable harm for which injunctive relief is appropriate, and that the governing law is that of Massachusetts.
On September 25, 2002, Lambert resigned from Sentient immediately, without prior notice. Lambert *502 then went to his office and printed the contents of his computerized Rolodex at Sentient. This Rolodex may contain some of Sentient’s confidential information. Lambert has returned what he-printed out, but he also has retained a copy thereof.
The next day, as part of his exit process, Lambert signed a Termination Agreement. By this agreement Lambert and Sentient generally released each other of any and all claims or causes of action arising out of his employment relationship. The Termination Agreement also contains the following two clauses:
9. Employee agrees to refrain from soliciting Sentient employees, vendors, carriers and Sentient clients.
10. Employee will not directly or indirectly engage in the business of providing aircraft chartering or fractional aircraft ownership related content or services for a period of 18 months from the date of termination.
On Sunday, October 20, 2002, Smith entered Sentient’s offices and distributed a letter communicating his immediate resignation.
On Monday, October 21, 2002, Goodwin sent an e-mail to Sentient communicating his immediate resignation.
EBJ Executive Business Jets, LLC, is a Delaware limited liability company, established by Lambert, Smith and Goodwin. At the first oral argument,[1] counsel for the defendants conceded, in response to a question from the Court, that Lambert, Smith and Goodwin are EBJ. EBJ has set up an office at 167 Washington Street in Norwell, Massachusetts, which is only about two miles from Sentient’s office in the same town.
On July 30, 2002, while Lambert, Smith and Goodwin were still employed by Sentient, Smith registered the Internet web address “ebjets.com.”
Sentient was originally established as eBizJets. It changed its name to Sentient in the summer of 2002, perhaps as a result of the resolution of a Lanham Act case brought against it in the U.S. District Court for the Northern District of Oklahoma by Bizjet International Sales and Support, Inc. Sentient continues, however, to use the descriptive phrase “Executive Business Jets” in connection with its Internet web site and other advertising.
Through EBJ, Lambert, Smith and Goodwin are competing directly and head-to-head with Sentient, at least insofar as on-demand jet charter business is concerned. They are advertising in The Wall Street Journal and on the Internet in ways that make their company almost indistinguishable from Sentient in essentially all respects. The texts and styles of advertising, including the logos used, the photographs and the colors, in both the press and on the Internet, are nearly identical to those of Sentient. They even have gone so far as to enter into an arrangement with the search engine Google to set up a facility on google.com which creates a link directly to EBJ’s website when a user enters a search for “Sentient Jet” or “eBizJets.”
It appears that Lambert, Smith and Goodwin are not only directly competing with Sentient through EBJ, they may be doing so using Sentient’s confidential and proprietary carrier, account and charter customer database information. To say the least, they are bold, aggressive and open in their practices.
Lambert, Smith and Goodwin proffer as excuses for their violations that, for them at least, circumstances at Sentient had changed so radically that their non-competition and confidentiality agreements should no longer be enforceable. They argue that their job situations changed, that their compensation was reduced, that they were not properly paid for overtime work, and one of them charges that he was sexually harassed by a Sentient executive.
Sentient responds, arguing that the changes in the defendants’ jobs were not radical; that their pay method was changed in a way that actually gave them opportunities to make even more than they previously were; that the overtime pay situation was complicated by sick days and vacation time; and that they know veiy little about the sexual harassment claim, it coming only two days before the complainer, Goodwin, quit.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, Sentient bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to Lambert, Smith and Goodwin from their being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Before assaying these issues, it is appropriate to canvass the relevant elements of Massachusetts law dealing with the enforcement of non-competition and confidentiality agreements.
The legal history of these kinds of agreements dates back at least to late 19th-Century England. Lord Macnaughten, in Nordenfeldt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535, at 565, reminded his readers that enforcement of these kinds of agreements is an exception to the general rule. He said:
The public have an interest in every person’s carrying on his trade freely: so has the individual. All interference with individual liberty of action in trading, and all restraints of trade themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is *503 a sufficient justification, and indeed it is the only justification, if the restriction is reasonable — reasonable, that is, in reference to the interest of the parties concerned and reasonable in reference to the interest of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public. That, I think, is the fair result of all of the authorities.
Massachusetts adopted Lord Macnaughten’s statement as early as 1922. See Sherman v. Pfefferkorn, 241 Mass. 468, 474 (1922).
More recently, the law has been recited as follows:
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty Bias Binding Co. v. Shevrin, [342 Mass. 714, 716 (1961)]. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the goodwill the employer has acquired through dealings with its customers. See All Stainless, Inc. v. Colby, [364 Mass. 773, 779-80 (1974)]. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co, Inc., 357 Mass. 106, 111 (1970).
Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974).
Here, there is no question or issue about whether Lambert, Smith and Goodwin, through EBJ, are directly competing with Sentient in the on-demand aspect of the jet chartering business, trading on Sentient’s goodwill, and may be using Sentient’s confidential information in doing so.
Goodwill is abroad term and encompasses a variety of intangible business attributes such as the “ ‘name, location and reputation, which tends to enable’ the business ‘to retain [its] patronage.’ ” Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961). An employer’s positive reputation or position in the eyes of its customers or potential customers is an element of goodwill. Marine Contractors Co., Inc., supra, 365 Mass. at 287-89. Goodwill is also generated by repeat business with existing customers. Id. Goodwill is a legitimate business interest that an employer is entitled to protect. Kroeger v. Stop & Shop Co., Inc., 13 Mass.App.Ct. 310, 316 (1982).
This Court finds and rules that Sentient has sufficient goodwill with regard to its relationship with those carriers, accounts and charter customers that were served by Lambert, Smith and Goodwin while they were Sentient’s employees to warrant protection from actions in violation of the non-competition and confidentiality agreements in issue here, unless a balancing of equities analysis calls for a different result.
Having determined that Sentient’s goodwill is protect-able, the Court next must determine whether injunctive relief is a proper method to effect that protection. Here the Court is guided by a reading of the plain language of the agreements. Each contains wording granting to Sentient the right to enforce those agreements by injunctive relief, as provided by the law of Massachusetts. The agreements are not complicated or hard to comprehend. Lambert, Smith and Goodwin each fully understood the language of the agreements they signed. Each, therefore, acquiesced in Sentient’s opportunity to seek injunctive relief upon their breach.
The defendants cannot argue that Sentient has demonstrated little actual or potential loss in volume of business following their exit. “[T]hat, without more, would not establish that [Sentient] has not suffered a loss of the goodwill which it is the lawful purpose of the [agreements] to protect.” Middlesex Neurological Assoc., Inc. v. Cohen, 3 Mass.App.Ct. 126, 132 (1975).
A non-competition agreement, to be enforceable, must be reasonable in geographical scope and length of time. See, e.g., Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975). All Stainless, Inc., supra, 364 Mass. at 779-80; Becker College of Business Admn. & Secretarial Science v. Gross, 281 Mass. 355 (1933). Eighteen months is certainly a reasonable time for the protection of the goodwill in issue here. So too is the essentially unlimited geographical reach, given that the business involved is the chartering and flying of private jet aircraft all around the country and, indeed, the world. Blackwell, supra, 368 Mass. at 229; Marine Contractors Co., Inc., supra, 365 Mass. at 289. And here, of course, Lambert, Smith and Goodwin have set up their competing operation just two miles away from Sentient.
Thus, Sentient has met its burden of showing a likelihood of success on the merits of a claim to protect its confidential information and goodwill from harm by Lambert, Smith and Goodwin and has demonstrated a basis for its claim to injunctive relief in that exercise. Nevertheless, the Court must still turn to the balancing of the harm to Lambert, Smith and Goodwin from the granting of injunctive relief against them against the possible losses to Sentient from not doing so.
Contracts like those in issue here “are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982). Thus, Lambert, Smith and Goodwin argue that enforcement of the agreements will impose undue hardships on them by barring them from earning a living, and supporting their families, in the business that they have spent a significant part of their adult working life.
The consequence of every covenant not to compete, however, is that the covenantor is deprived of a possible means of earning his living, within a de *504 fined area and for a limited time. That fact alone does not make such covenants unenforceable.
Marine Contractors Co., Inc., supra, 365 Mass. at 289.
By virtue of the general release language in his Termination Agreement, Lambert may be in a somewhat different position than Smith and Goodwin. This assumes, of course, that that agreement is itself enforceable. Lambert argues that it is not, because of alleged improper coercion at the time of its execution. If Lambert’s Termination Agreement is not enforceable, however, then the release portion thereof also falls away, and his original non-competition and confidentiality agreement with Sentient becomes the controlling document; and Lambert rejoins Smith and Goodwin in all essential respects.
This Court is not convinced that the changes in workplace situations argued by the defendants — who on these issues bear the burden of proof — are sufficient to cause the agreements to be not enforceable.
The Court now focuses on the balancing of the equities. Who among the parties will suffer the most by the granting or not granting of the injunctive relief sought?
“Economic harm alone . . . will not suffice as irreparable harm unless ‘the loss threatens the very existence of the movant’s business.’ Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987).” Tri-Net Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227-28 (2001).
At this point, the defendants are clearly a potential threat to all of Sentient’s business, and an actual threat to the on-demand portion thereof. But it appears that they so far are only operating in an area of the business that is a small portion of what Sentient does. While the facts are disputed — with the defendants arguing that what they do is only about 10% of what Sentient does, and Sentient responding that the percentage is more like 30% — clearly, all of Sentient’s business is not being affected at this time. The defendants claim, and there is no evidence to the contrary, that they are not in the TravelCard membership end of the jet charter business. Rather, they say they only do on-demand services for clients who require less frequent private jet accommodations. This, of course, still is competition, albeit not so challenging as it would be if the defendants were in both the on-demand and the more extensive TravelCard membership business.
Given the present circumstances it cannot be said that Sentient is threatened with the loss of the veiy existence of its business. Therefore, to close the defendants down totally would impose on them afar greater burden than that suffered by Sentient in not giving it the preliminary relief it seeks. After all, the defendants’ profits or Sentient’s losses will be a fair measure of the damages sustained or to be sustained in the on-demand business. At the same time, the defendants have demonstrated the very real possibility of expanding in a way that may truly threaten the existence of Sentient’s business and will seriously tread on all of its goodwill. However, neither irreparable harm, nor a balance of equities, is seen yet to fall in Sentient’s favor. For this reason, and given the facts as presented, this Court issues the following Order.

ORDER

So long as the defendants — as they insist they are — refrain from conducting, or holding themselves out as being able to conduct, private jet chartering business in any manner other than providing on-demand services for their customers, and they further comply with the following directives and conduct, no preliminary injunctive relief will be granted. If, however, by discovery or otherwise, the defendants, or any one of them, are revealed to be acting in a manner inconsistent with any of the following directives or conduct, the plaintiff immediately may seek injunctive relief from this Court.
The directives and conduct referred to above are: (1) to forthwith change the name of the defendants’ company from “EBJ Executive Business Jets” to some name substantially different from that, and different from “eBizJets”; (2) to forthwith shut down their Internet website as presently configured and, should they choose to have such a website, to redesign it in ways that make it clear, in text, coloration and pictures, that they are not Sentient, eBizJets or Executive Business Jets, and are not providing any of the services provided by Sentient, except on-demand jet charter services; (3) to refrain from soliciting or offering jet charter service business from or to any knowm existing customer of Sentient by calls, letters, mailings, or any other form of direct communication, provided that they may accept and service unsolicited calls for on-demand jet charter services; (4) to direct Google to immediately unlink or disconnect any references on its search engine that directs people seeking to connect with Sentient, Executive Business Jets, or eBizJets to any website of the defendants or their company; (5) to forthwith return to Sentient all originals and all copies of any materials taken from Sentient, including particularly, but without limitation, any copies of Lambert’s Sentient Rolodex; and (6) to not solicit or induce any employees of Sentient to leave their employ and join the defendants at their company.
So long as they remain together in ajoint enterprise, the limitations of the foregoing directives and conduct shall remain in place until the expiration of 18 months from the date that the last of Lambert, Smith and Goodwin left their employ with Sentient. Otherwise, they will expire serially from the last day that each of Lambert, Smith and Goodwin left Sentient’s employ.

The matter of injunctive relief came first before the Court on November 12, 2002, when the defendants asked for, and were granted, until November 15, to file written oppositions and present further argument.