Hogan, Maureen B., J.
The plaintiff National Engineering Service Corporation (“NESC”) brings this action to enforce provisions of a confidentiality, non-solicitation and non-competition agreement signed by one of its former employees, the defendant Travis Grogan (“Grogan”), and to recover damages.[1] NESC also seeks to recover damages and enforce the agreement against Grogan’s current employer, defendant CCSI, Inc. (“CCSI”).[2] The matter is before the court on NESC’S motion for preliminary injunction, which defendants oppose. After hearing and for the following reasons, the motion is allowed.
BACKGROUND
The following facts were obtained from the verified complaint and affidavits submitted by the parties. Plaintiff NESC is a recruiting and staffing firm which recruits qualified engineering and computer skilled candidates and places them at companies throughout the United States. NESC is a Massachusetts corporation with a principal place of business at 10 Cedar Street, Woburn, MA and an office in Portsmouth, New Hampshire. Defendant CCSI is also a recruiting and staffing firm which recruits and places employment candidates with engineering and computer skills throughout the country. CCSI is a New Hampshire corporation with a principal place of business in Stratham, NH. NESC and CCSI’s offices in New Hampshire are located less than 10 miles apart. NESC and CCSI are competitors in the staffing industry.
Defendant Grogan is a former employee of NESC. Grogan first worked for NESC from January 27, 1998 through November 3, 1998, during which time he worked as a recruiter of potential candidates for placement and as an Account Manager, which position included identifying and servicing customers for NESC’s staffing services. NESC had hired Grogan after he graduated from college, at which time Grogan had no prior experience in the staffing industry. NESC rehired Grogan as an Account Executive in October 2002 with an initial base salary and subsidy of $550.00 per week, plus commissions.[3] On October 16, 2002, Grogan accepted the position with NESC and signed a “Restrictive Covenant/Nondisclosure Agreement” (hereinafter “Agreement”).
The Agreement contained both non-competition and confidentiality provisions. The non-competition covenants provide:
Agreement Not To Compete for Accounts or Personnel. Employee agrees that during his/her employ *452 ment with employer and/or the twelve (12) months after such employment ends, he/she will not directly or indirectly, contact, solicit, divert, take away or attempt to contact, solicit, divert or take away any staff employee, temporary personnel, customer, account, business or goodwill from employer, either for Employee’s own benefit or to benefit some other person or entity, and will not aid or assist any other person or entity to engage in any such activities.
Non-competition Agreement. Employee agrees that in the event of termination of employment for any reason whatsoever, he shall not, for a period of twelve (12) months from the date of such termination (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein) either directly or indirectly, on his own account or as agent, stockholder, employer, employee, consultant, independent contractor or otherwise in conjunction with any other person or entity, engage in competition with the employer within a radius of fifty (50) miles of any office(s) and/or area(s) to which he was assigned and/or managed for the Employer; nor will he solicit accounts, personnel, or engage in any other competitive activities within the above referenced geographic locations(s). Employee further agrees that regardless of geographic location, he will not, during said time period, service any customers the Employer has done any business with during the preceding eighteen (18) months. Employer acknowledges that doing so in any manner would interfere with, diminish and otherwise jeopardize and damage the business and goodwill of the Employer.
In addition, the confidentiality provision of the Agreement provides:
Non-Disclosure Agreement. Employee agrees that except as directed by Employer, the employee will not at any time, whether during or after his employment with Employer, use for any reason or disclose Employer’s Confidential Information[4] or permit any person, to examine and/or make copies of any documents which may contain or are derived from Confidential Information, whether prepared by the employee or otherwise, without the prior written permission of the Employer.
Grogan worked for NESC out of the Portsmouth, New Hampshire office from October 16, 2002 through August 23, 2006, when Grogan was terminated by NESC. During this time, as an Account Executive, Grogan worked in sales, which included identifying, soliciting, and servicing customers for NESC’s staffing services. Given Grogan’s limited experience in the staffing industry, all of which was obtained at NESC during his employment in 1998, NESC provided Grogan with extensive training and resources. After accompanying senior sales representatives and being introduced to NESC clients and customers, Grogan took over and began servicing existing accounts, clients and customers. NESC’s business involves substantial sales effort by salesmen such as Grogan to locate positions, determine the needs of the customer-company, identify potential candidates to fill the positions, and place candidates in positions. NESC’s success in sales is dependent upon the development and maintenance of good and loyal relationships with customers and obtaining repeat business with such customers.
While employed at NESC, Grogan was responsible for developing and increasing sales. His duties thus included creating leads, locating positions, determining the needs of the customer-company, Identifying potential candidates to fill the positions, and placing candidates in positions. Grogan also assisted in managing, supervising, and training other account managers and recruiters at NESC. In these capacities, Grogan was responsible for developing and maintaining good relationships with customers, clients and accounts, and for generating repeat business. To enable Grogan to successfully serve NESC’s customers, clients and accounts, NESC provided Grogan with information regarding the prices, terms and conditions of NESC’s contracts with its customers, as well as NESC’s pricing policies and price lists, marketing and business plans, and contractor list and database. NESC also provided Grogan with resources to attend sales conferences and to travel and entertain existing and potential clients and customers, in order to develop good relationships, maintain NESC’s good will with them, and generate business.
Staffing firms, like NESC and CCSI, conduct their business of placing employment candidates in two ways. First, NESC and CCSI contracts directly with employer companies to identify and place candidates in staffing positions within those companies. Second, NESC and CCSI do business by contracting with so-called Managed Service Providers to place candidates in positions in larger companies that use the services of such Managed Service Providers. Managed Service Providers typically work with large companies to assist them in hiring for open positions. Supplier-vendors, like NESC and CCSI, contract with the Managed Service Providers to be able to submit potential candidates for open positions at the client-companies of the Managed Service Provider. The agreements between staffing firms, like NESC and CCSI, and Managed Service Providers are not general agreements under which the staffing company can submit potential candidates for all of the client-companies serviced by the Managed Service Provider. Rather, the supplier-vendor staffing firm has to be approved to submit candidates to each individual client-company serviced by the Managed Service Provider.
While working in sales at NESC, Grogan worked with Managed Service Providers to place candidates in *453 positions at the client-companies they serviced and worked directly with companies to provide staffing services. The success of NESC depended upon relationships developed and maintained by salesmen such as Grogan with Managed Service Providers, as well as with companies with which the salesmen dealt directly. The Managed Service Providers with whom Grogan worked while at NESC included Comensura and Ensemble-Chimes (“Ensemble”). While Grogan was working at NESC, NESC had agreements with Comensura to participate as a supplier-vendor with respect to Comensura’s clients Progress Energy, Siemens, Atos Origin, Visa and Entergy.[5] During the time of Grogan’s employment, NESC also had agreements with Ensemble to participate as a supplier-vendor with respect to Ensemble clients Bayer, Exelon and TECO.[6]
On or about August 23, 2006, NESC terminated Grogan. Thereafter, Grogan began searching for a new job. In October 2006, Grogan was contacted by Michael Moreau (“Moreau”), Manager of CCSI, regarding employment. Shortly thereafter, CCSI hired Grogan as a recruiting manager to hire and train recruiters. Grogan began working for CCSI on October 30, 2006. Since CCSI hired Grogan, he has hired seven new recruiters.
CCSI has had agreements and worked with Com-ensura since 2000 and with Ensemble since 2001. Presently, CCSI has agreements with Comensura with respect to Comensura clients Siemens, Entergy and Atos Origin and with Ensemble with respect to Ensemble client TECO. The record does not show when CCSI entered into an agreement with Comensura with respect to Entergy or when CCSI entered into an agreement with Ensemble with respect to TECO. The record does show, however, that CCSI entered into agreements with Comensura with respect to Siemens and Atos Origin after Grogan had begun working at CCSI. Grogan and CCSI do not dispute that NESC had agreements with Comensura with respect to both Siemens and Atos Origin and with Ensemble with respect to Teco while Grogan worked at NESC, and that Grogan serviced these accounts. Servicing these accounts would require developing relationships with Comensura and Ensemble and knowledge regarding the needs of Siemens, Atos Origin, and Teco.
The verified complaint,- signed by John Madden (“Madden”), Vice President of sales at NESC, states: “Shortly after hiring Grogan, CCSI presented candidates for potential openings at Progress Energy, Siemens, Entergy, Bayer, Exelon, TECO, Atos Origin and Visa, accounts that Grogan was servicing at NESC prior to terminating his employment.”[7] In the affidavits of Grogan and Moreau on behalf of CCSI, Grogan and CCSI dispute that they presented candidates for positions at Progress Energy, Visa, Bayer and Exelon, stating that they did not have agreements with Com-ensura and Ensemble with respect to these companies. Grogan and CCSI, however, admit that CCSI has agreements with Comensura with respect to Siemens, Entergy and Atos Origin and with Ensemble with respect to TECO, but they attempt to dispute the verified allegation that they presented candidates for positions at these companies by stating in their affidavits that they have not had any direct contact with any of these Comensura or Ensemble clients. Significantly, however, Grogan and CCSI do not deny that they presented candidates for potential openings at Siemens, Entergy, Atos Origin and TECO through Comensura and Ensemble, which is the manner in which such business is conducted.
Additionally, in his affidavit, Madden states: “In March 2007, I learned from various people within Comensura that after Grogan began his position at CCSI,... CCSI solicited Comensura in order to obtain access to his former National Engineering clients: Progress Energy, Siemens, Atos Origin and Visa. I was also informed that Grogan was listed as the sales contact person at CCSI with respect to at least Siemens and Atos Origin.” Neither Grogan, nor Moreau on behalf of CCSI, deny that CCSI solicited Comensura after Grogan’s hire to obtain access to Progress Energy, Atos Origin and Visa, accounts Grogan serviced while at NESC, or that Grogan is identified as the sales contact person at CCSI with respect to Siemens and Atos Origin. In his affidavit, dated June 11, 2007, Moreau does credibly demonstrate that CCSI was in contact with Comensura with respect to Siemens before Grogan began working at CCSI. An email from Comensura, attached to Moreau’s affidavit, shows that the contract with respect to Siemens was forwarded to Moreau on November 1, 2006. There being no other evidence of Grogan’s involvement in obtaining this agreement, CCSI’s participation in Comensura’s Siemens program appears to be the result of Moreau’s efforts alone. Moreau and Grogan, however, do not dispute that once the account was established with Comensura for Siemens, Grogan was made the sales contact and as such would be the individual servicing the account. Furthermore, the record also shows that Grogan was involved in obtaining the agreement with Comensura with respect to Atos Origin. As Moreau states in his June 11 affidavit, Comensura directed the invitation for CCSI to participate in its Atos Origin program directly to Grogan in November 2006, which was the same month Grogan began working at CCSI, and that on November 23, 2006, CCSI signed a contract with Comensura to participate in its Atos Origin Program. Neither Moreau, nor Grogan, disputes that Grogan was made sales contact on the Atos Origin account and serviced that account.
DISCUSSION
In order to obtain a preliminary injunction, NESC must show: (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of NESC’s likelihood *454 of success on the merits, the risk of irreparable harm to NESC outweighs the potential harm to Grogan or CCSI in granting the injunction. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
I. Likelihood of Success on the Merits
Covenants not to compete, which generally include covenants not to work for a competitor, not to solicit customers of the former employer, and not to use confidential or proprietary information, are enforceable if they protect a legitimate business interest of the employer and based upon all of the circumstances, they are reasonable in geographic and temporal scope. All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974). A covenant not to compete solely designed to protect an employer from ordinary competition does not serve a legitimate business interest and is not enforceable. Marine Contractors Co., Inc., 365 Mass. at 287-88; Richmond Bros., Inc. v. Westinghouse Broadcasting Co., Inc., 357 Mass. 106 (1970). Protection of an employer’s good will, however, is a legitimate business interest that may be secured through enforcement of covenants not to compete. All Stainless, Inc., 364 Mass. at 779-80. Good will is generally understood to refer to the benefit and advantage that accrue to a business from its positive reputation with its customers, acquired by its repeat business dealings with them, that enable it to retain their patronage and obtain new business. Marine Contractors Co., Inc., 365 Mass. at 287; see Kroeger v. Stop & Shop Companies, 13 Mass.App.Ct. 310, 316 (1982), citing Angier v. Webber, 14 Allen 211, 215 (1867). A former employee with close association and relationships with an employer’s customers is in a position to harm the employer’s good will because the close relationship with the employer’s customers may cause those customers to associate the former employee, and not the employer, with the product and services delivered to the customer through the efforts of the former employee. All Stainless, Inc., 364 Mass. at 779-80. Courts have been particularly willing to enforce covenants not to compete in order to preserve good will in the sales, marketing and staffing industries. All Stainless, Inc., 364 Mass. at 780-81; Darwin Partners, Inc. v. Signature Consultants LLC, 2000 Mass.Super. LEXIS 614; Bowne of Boston, Inc. v. Levine, 7 Mass. L. Rptr. 685 (1997); Oxford Global Resources, Inc. v. Consolo et al., 16 Mass. L. Rptr. 415 (2002); Fortune Personnel Consultants of Boston, Inc. v. Hagopian, 8 Mass. L. Rptr. 49 (1997); Modis, Inc. v. The Revolution Group, Ltd., 11 Mass L. Rptr. 246 (1999); Stone Legal Resources Group, Inc. v. Glebus, 15 Mass. L. Rptr. 738 (2002).
By the non-compete covenants of the Agreement signed and agreed to by Grogan, he agreed that for a period of 12 months after termination of employment,[8] he would not 1) engage in competition with NESC, by soliciting accounts or personnel or by other competitive activities, within a radius of 50 miles of any office and/or area to which Grogan was assigned and/or managed; 2) directly or indirectly contact, solicit or divert any “customer, account, business or goodwill” from NESC or aid another person or entity to engage in such activities; or 3) service any customers NESC has done business within the preceding 18 months. Given the competitive nature of the staffing industry, the court finds that these covenants restricting competition protect legitimate business interests of NESC and are reasonable in temporal and geographic scope. The business in which NESC and CCSI are involved is a highly competitive industry, the success of which is dependent on the development and maintenance of good relationships with employer companies with which candidates are directly placed, as well as with Managed Service Providers through which candidates are placed at larger companies. Other than his employment at NESC, Grogan had no experience in the staffing industry. All of his knowledge of the business was gained through training provided by NESC and by working at NESC. His relationships with the customers and accounts of NESC were all developed and maintained while he was employed at NESC, through use of the resources and confidential information of NESC. The success of NESC’s business is grounded upon relationships and good will with its corporate customers and Managed Service Providers, developed through its sales executives, such as Grogan. NESC is entitled to protect its good will and relationships with its customers and accounts through the non-compete covenants to which Grogan agreed. These covenants restrict Grogan from engaging in competition with NESC and from soliciting and/or servicing its clients and accounts for a reasonable period of time — one year.[9] The general non-competition covenant which restricts Grogan from working for a competitor within 50 miles of the office or area in which he worked while at NESC is also reasonable in scope. These covenants do not restrict Grogan from using his own skills, knowledge or talent, but rather prevent him from trading on the good will of NESC by restricting him from using the relationships he developed with NESC’s customers, clients and accounts and the confidential information of NESC, including knowledge of these customers and their needs.
By going to work for CCSI, whose Stratham, NH office is less than 50 miles from the NESC office in Portsmouth, NH, where Grogan worked,[10] less than three months after terminating employment with NESC, Grogan violated this non-compete provision. Even if Grogan’s employment at CCSI had been restricted to hiring and training recruiters, performing such services for CCSI is engaging in competition with NESC. The record shows, however, that Grogan’s employment for CCSI was not so limited to hiring and training, but included contacting, soliciting and ser *455 vicing accounts and customers with which NESC had done business during the eighteen (18) months before Grogan left NESC. Grogan was in contact with Com-ensura during his first month of employment to conduct business with the client-companies of Comensura with which Grogan conducted business through Comensura when he was at NESC. Specifically, Comensura directed the invitation for CCSI to participate in its Atos Origin program directly to Grogan in November 2006, and on November 23, 2006, CCSI signed a contract with Comensura to participate in its Atos Origin Program. Moreover, neither Grogan nor CCSI deny that Grogan was identified as the sales contact person with respect to Atos Origin and Siemens, demonstrating that he was responsible for servicing those accounts and customers.
Furthermore, Grogan and CCSI do not deny that they presented candidates for potential openings at Siemens, Entergy, Atos Origin and TECO through Comensura and Ensemble, although they do deny any direct contact with these client-companies of the Managed Service Providers. The fact that Grogan and CCSI did not have direct contact or directly solicit or present candidates to these companies does not insulate their activities from falling within the prohibition of the non-compete provisions of Grogan’s Agreement with NESC. The business of CCSI and NESC is not done through direct contact with large companies who are clients of Managed Service Providers. Placement of candidates at such companies is effected through Managed Service Providers, such as Ensemble and Comensura. The development and maintenance of relationships and good will with these Managed Service Providers, and knowledge of the needs of the companies they service, are necessary to be successful in this staffing industry. In this industry, such Managed Service Providers clearly qualify as customers and accounts of staffing companies such as NESC and CCSI. Grogan’s contact with and solicitation of Com-ensura and Ensemble to conduct business, and his servicing of accounts with them, violated the non-compete provisions of the Agreement. Presenting candidates for positions through these Managed Service Providers with whom Grogan worked while at NESC and Grogan’s assistance in getting new agreements for CCSI with these Managed Service Providers constitutes competitive activities that are restricted by the non-compete covenants of his Agreement with NESC. Accordingly, based upon the record before it, the court finds that NESC has demonstrated a likelihood of success on the merits, that is, that Grogan violated the non-competition provisions of his Agreement with NESC.[11]
II. Likelihood of Irreparable Harm and Balance of Harms
NESC has also demonstrated that enforcement of the non-compete provisions of Grogan’s employment agreement is necessary to prevent it from suffering irreparable harm. Grogan’s contact with and solicitation of Comensura and Ensemble to get new agreements with their client-companies, his servicing of accounts with them, and his assistance in presenting candidates for positions at their client-companies which he also serviced while at NESC, is substantially likely to cause NESC to suffer a loss of good will and business. Loss of good will is not easily measured and any harm therefore would be irreparable.
The court finds that the irreparable harm that NESC is likely to suffer by Grogan’s competitive activities in violation of the non-compete provisions of the employment agreement outweighs the risk of harm that Grogan will suffer if enjoined from such activities for a period of six months from the date of this order. Grogan will still be able to work in the staffing industry provided he does not engage in competitive activities with NESC within 50 miles of the office in which he worked and provided he does not contact or solicit customers or accounts of NESC, including Managed Service Providers, or service such customers or Managed Service Providers with which he worked during the 18 months before his employment terminated with NESC on August 23, 2006. Moreover, the injunction ordered by the court today restrains Grogan from engaging in competitive activities with NESC while employed at CCSI for a period of six months, but allows Grogan to continue to work at CCSI if his employment is limited to the hiring and training of recruiters. The court finds that such hiring and training services, although competitive activities in violation of the non-compete provisions of the Agreement, are not such direct competition with NESC that would cause NESC to suffer irreparable harm by the loss of its good will.[12]
The non-compete provisions of Grogan’s employment agreement with NESC restrict Grogan’s competitive activities for a period of one year from his termination of employment with NESC, which was August 23, 2006. By the terms of the Agreement, this period does not include any period of violation or period of time required for litigation to enforce the covenants herein. For approximately two months after leaving NESC, Grogan abided by his agreement. He went to work for CCSI, however, on October 30, 2006 and within the first month engaged in competitive activities likely to cause NESC to suffer loss of good will. On May 4, 2007, this court entered a temporary restraining order restraining Grogan from soliciting any of NESC’s customers serviced or developed by Grogan while employed by NESC and restraining CCSI from soliciting any of NESC’s customers serviced or developed by Grogan while employed by NESC that were not already customers of CCSI when Grogan began working at CCSI. This temporary restraining order was continued by agreement of the parties. For a period of six months, from October 30, 2006 through May 4, 2007, Grogan was in violation of the non-competition covenants of the Agreement. During this pe *456 riod, NESC likely suffered loss of its good will, which cannot be measured. If allowed to continue to trade on NESC’s good will, using relationships and information obtained by working at NESC, Grogan will likely cause further irreparable harm to NESC. To prevent Grogan from benefitting from his breach of the non-compete provisions and to give NESC the benefit of its bargain, this court enjoins Grogan from engaging in activities in violation of the non-compete covenants of his Agreement with NESC for a period of six months from the date of this order. A period of six months is reasonable because that is the length of time that Grogan violated the Agreement before the temporaiy restraining order was issued by the court.
ORDER
For the foregoing reasons, it is ORDERED as follows:
1. For a period of six (6) months from the date of this order, the defendant Travis Grogan is preliminarily enjoined from directly or indirectly contacting, soliciting, diverting or taking away any customer or account of NESC, including Managed Service Providers, or any business or goodwill of NESC, for his own benefit or to benefit CCSI or other person or entity.
2. For a period of six (6) months from the date of this order, the defendant Travis Grogan is preliminarily enjoined from directly or indirectly contacting, soliciting, diverting or taking away any staff employee or temporaiy personnel of NESC, for his own benefit or to benefit CCSI or other person or entity.
3. For a period of six (6) months from the date of this order, the defendant Travis Grogan is preliminarily enjoined from directly or indirectly servicing any customers, including Managed Service Providers, that NESC did any business with during the eighteen (18) months prior to Grogan’s termination of employment with NESC on August 23, 2006, for his own benefit or to benefit CCSI or other person or entity.
4. For a period of six (6) months from the date of this order, the defendant Travis Grogan is preliminarily enjoined from directly or indirectly engaging in competitive activities with NESC within a radius of fifty (50) miles of any office(s) and/or area(s) to which he was assigned and/or managed for NESC for his benefit or the benefit of CCSI or other person or entity. This injunction does not enjoin Grogan from continuing employment with CCSI, provided his employment is restricted to the hiring and training of recruiters.
5. The defendant Travis Grogan is preliminarily enjoined from directly or indirectly using or disclosing any confidential or proprietary information of NESC, including information concerning NESC’s clients, including their business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel and other data; the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporaiy or permanent employment by employer; job order specifications and other particular characteristics and requirements of persons generally hired by a client; and specific job listings, mailing lists, computer runoffs, and financial information.
6.The defendant CCSI is preliminarily enjoined from employing the defendant Travis Grogan in direct or indirect violation of the non-competition and nondisclosure provisions contained in Grogan’s Agreement with NESC. This injunction does not enjoin CCSI from continuing to employ Grogan to hire and train recruiters, provided his employment is restricted to such services.

 In its verified complaint, NESC has alleged claims against Grogan for breach of contract, breach of covenant of good faith and fair dealing, misappropriation of trade secrets and confidential information, and civil conspiracy.

NESC has alleged claims against CCSI for interference with contractual relations, misappropriation of trade secrets and confidential information, civil conspiracy, and violation of G.L.C. 93A.

From November 3, 1998 through October 2002 when Grogan was rehired by NESC, Grogan did not work in the staffing industry.

The term “Confidential Information” as defined in the Agreement includes: “information concerning Employer’s clients, including their business affairs, special needs, preferred methods of doing business, methods of operation, key contact personnel and other data, all of which provides employer with a competitive advantage and none of which is readily available except to employees of Employer” and “the names, addresses, telephone numbers, qualifications, education, accomplishments, experience, availability, resumes and other data regarding persons who have applied or been recruited for temporaiy or permanent employment by employer, as well as job order specifications and other particular characteristics and requirements of persons generally hired by a client, specific job listings, mailing lists, computer runoffs, financial and other information, all of which provides employer with a competitive advantage and none of which is readily available except to employees of Employer.”

Grogan states in his affidavit that to his knowledge NESC did not have any agreement with a Managed Service Provider with respect to Entergy while he worked for NESC. Grogan does not dispute, however, that NESC had agreements with Comensura with respect to Progress Energy, Siemens, Atos Origin, and Visa, and that he serviced these accounts. •

Grogan does not dispute that NESC had such agreements with Ensemble with respect to Bayer, Exelon and TECO, and that he serviced these accounts.

From a review of the evidence submitted in support of NESC’s motion for a preliminary injunction, this allegation in the verified complaint appears to be based upon hearsay. Similarly, Madden’s affidavit also contains hearsay in that his sworn statements are based upon information regarding Grogan’s activities obtained from employees of Comensura. On a motion for a preliminary injunction, the court may consider evidence that may be inadmissible at trial in the interest of preventing irreparable harm. Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 711 n.9 (1990). Given the hearsay nature of this evidence, the court will consider it only to the extent that it is supported by other evidence in the record or not disputed or denied by Grogan or CCSI.

The Agreement specifically states that this period excludes any period of violation or period of time required for litigation to enforce the covenants contained in it.

The court finds the period reasonable even where it is extended beyond one year because a period of violation or period necessary for enforcement is excluded.

The record shows that the offices are less than 10 miles apart.

CCSI and Grogan argue that NESC is not likely to succeed on the merits because Grogan is excused from his obligations under the Agreement by NESC’s breach of its agreement with Grogan to pay a 7% commission under certain circumstances. On this record, the court does not find that NESC materially breached its employment agreement with Grogan so as to excuse him from his obligations under the non-compete covenants of the Agreement.

Grogan will, however, continue to be restricted from sharing NESC’s confidential information with CCSI; this restriction is not limited in duration.